BYUS-MANKIN LUMBER COMPANY, A CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 106994.   Promulgated March 18, 1942.

*Carl C. Sanders, Esq.*, for the petitioner.
*E. L. Corbin, Esq.*, for the respondent.

OPINION.

BLACK: The Commissioner has determined a deficiency in petitioner's income tax for the year 1936 of $1,578.13 and a deficiency in petitioner's excess profits tax for the same year of $272.79. The deficiencies are due to three adjustments which the Commissioner made in the income tax return which petitioner filed for the taxable year. These adjustments were as follows:

Unallowable deductions and additional income:

| | |
|---|---|
| (a) Loss on construction contracts | $10,526.84 |
| (b) Income tax deducted | 86.66 |
| (c) Loss on sales | 60.00 |
| Total | 10,673.50 |

The petition assigns error only as to adjustment (a) shown above. Facts have been stipulated as follows:

The petitioner is a corporation, duly organized and existing under and by virtue of the laws of the State of West Virginia, with its principal office at No. 801 North Kanawha Street, Beckley, West Virginia. The return for the period here involved was filed with the Collector for the Southern District of West Virginia.

The taxes in controversy are income and excess profit taxes for the calendar year 1936, in the amount of $1,850.92, together with the interest thereon, except the taxpayer has heretofore submitted to the payment of the proper taxes described in item (d) Schedule No. 1-A, showing an additional income of $60.00, and item (c) Schedule No. 1 showing additional income of $86.66.

The taxpayer, Byus-Mankin Lumber Company, entered into a contract, No. W-6144-QM-18, dated March 25, 1933, with the United States Government, for the construction and completion of a bachelor officers' quarters at Fort Humphrey, now known as Fort Belvoir, Virginia.

This contract was entered into prior to August 10, 1933, the effective date of the National Industrial Recovery Act and the President's Reemployment Agreement of the United States Government. U. S. C. A. Title 15, Paragraphs 701 to 712; U. S. C. A. Title 15, Paragraphs 703 and 704.

The contractor in this instance signed this agreement to comply with the National Industrial Recovery Act and the President's Reemployment Agreement and codes of fair competition adopted thereunder, and did comply with the terms and provisions of said Act and Agreement, whereby and by reason thereof the contractor was forced to pay out and expend the sum of $10,526.84 as an additional outlay and expense for material and labor. The taxpayer suffered a net loss in excess of $30,000.00 on this contract.

The contract was completed during the calendar year 1934, or the early part of 1935, and the taxpayer, as such contractor, filed with the Comptroller General of the United States, Claim No. DO 443555 (1) for $10,526.84 under the Act of June 16, 1934, 48 Stat. 974, U. S. C. A. Title 41, Paragraph 28, within the time prescribed by law. This claim for the balance due from the Government to the taxpayer was carried on the books of the Byus-Mankin Lumber Company as an asset of said Company until the 28th day of July, 1936, at which time the Byus-Mankin Lumber Company received a letter from the Comptroller General disallowing this claim altogether. The balance due on this contract and claim in the sum of $10,526.84 was charged off as a loss by the taxpayer for the year

1936, that being the year that the claim was disallowed by the Comptroller General.

The Congress of the United States, 1938 Session, passed Senate Bill No. 3628 to provide for certain relief of contractors on Government projects who suffered losses by reason of the enactment of the National Industrial Recovery Act.

This claim is now pending in the Court of Claims at Washington, D. C.

The Byus-Mankin Lumber Company has at all time kept its books and records and filed its income tax returns on the accrual basis.

The President's Reemployment Agreement, which petitioner signed and in which it agreed to comply with the National Recovery Act and the codes of competition adopted thereunder, was as follows:

PRESIDENT'S REEMPLOYMENT AGREEMENT

(Authorized by Section 4a National Industrial Recovery Act)

During the period of the President's emergency reemployment drive, that is to say, from August 1 to December 31, 1933, or to any earlier date of approval of a Code of Fair Competition to which he is subject, the undersigned hereby agrees with the President as follows:

(1) After August 31, 1933, not to employ any person under 16 years of age, except that persons between 14 and 16 may be employed (but not in manufacturing or mechanical industries) for not to exceed 3 hours per day and those hours between 7 a. m. and 7 p. m. in such work as will not interfere with hours of day school.

(2) Not to work any accounting, clerical, banking, office, service, or sales employees except outside salesmen) in any store, office, department, establishment, or public utility, or on any automotive or horse-drawn passenger, express, delivery, or freight service, or in any other place or manner, for more than 40 hours in any 1 week and not to reduce the hours of any store or service operation to below 52 hours in any 1 week, unless such hours were less than 52 hours per week before July 1, 1933, and in the latter case not to reduce such hours at all.

(3) Not to employ any factory or mechanical worker or artisan more than a maximum week of 35 hours until December 31, 1933, but with the right to work a maximum week of 40 hours for any 6 weeks within this period; and not to employ any worker more than 8 hours in any 1 day.

(4) The maximum hours fixed in the foregoing paragraphs (2) and (3) shall not apply to employees in establishments employing not more than two persons in towns of less than 2,500 population which towns are not part of a larger trade area; nor to registered pharmacists or other professional persons employed in their profession; nor to employees in a managerial or executive capacity, who now receive more than $35 per week; nor to employees on emergency maintenance and repair work; nor to very special cases where restrictions of hours of highly skilled workers on continuous processes would unavoidably reduce production but, in any such special case, at least time and one third shall be paid for hours worked in excess of the maximum. Population for the purposes of this agreement shall be determined by reference to the 1930 Federal census.

(5) Not to pay any of the classes of employees mentioned in paragraph (2) less than $15 per week in any city of over 500,000 population, or in the immediate trade area of such city; nor less than $14.50 per week in any city of between 250,000 and 500,000 population, or in the immediate trade area of such city; nor less than $14 per week in any city of between 2,500 and 250,000 population, or in the immediate trade area of such city; and in towns of less than 2,500

population to increase all wages by not less than 20 percent, provided that this shall not require wages in excess of $12 per week.

(6) Not to pay any employee of the classes mentioned in paragraph (3) less than 40 cents per hour unless the hourly rate for the same class of work on July 15, 1929, was less than 40 cents per hour, in which latter case not to pay less than the hourly rate on July 15, 1929, and in no event less than 30 cents per hour. It is agreed that this paragraph establishes a guaranteed minimum rate of pay regardless of whether the employee is compensated on the basis of a time rate or on a piecework performance.

(7) Not to reduce the compensation for employment now in excess of the minimum wages hereby agreed to (notwithstanding that the hours worked in such employment may be hereby reduced) and to increase the pay for such employment by an equitable readjustment of all pay schedules.

(8) Not to use any subterfuge to frustrate the spirit and intent of this agreement which is, among other things, to increase employment by a universal covenant, to remove obstructions to commerce, and to shorten hours and to raise wages for the shorter week to a living basis.

(9) Not to increase the price of any merchandise sold after the date hereof over the price on July 1, 1933, by more than is made necessary by actual increases in production, replacement, or invoice costs of merchandise, or by taxes or other costs resulting from action taken pursuant to the Agricultural Adjustment Act, since July 1, 1933, and, in setting such price increases, to give full weight to probable increases in sales volume and to refrain from taking profiteering advantage of the consuming public.

(10) To support and patronize establishments which also have signed this agreement and are listed as members of N. R. A. (National Recovery Administration).

(11) To cooperate to the fullest extent in having a Code of Fair Competition submitted by his industry at the earliest possible date, and in any event before September 1, 1933.

(12) Where, before June 16, 1933, the undersigned had contracted to purchase goods at a fixed price for delivery during the period of this agreement, the undersigned will make an appropriate adjustment of said fixed price to meet any increase in cost caused by the seller having signed this President's Reemployment Agreement or having become bound by any Code of Fair Competition approved by the President.

(13) This agreement shall cease upon approval by the President of a code to which the undersigned is subject; or, if the N. R. A. so elects, upon submission of a code to which the undersigned is subject and substitution of any of its provisions for any of the terms of this agreement.

(14) It is agreed that any person who wishes to do his part in the President's reemployment drive by signing this agreement, but who asserts that some particular provision hereof, because of peculiar circumstances, will create great and unavoidable hardship, may obtain the benefits hereof by signing this agreement and putting it into effect and then, in a petition approved by a representative trade association of his industry, or other representative organization designated by N. R. A., may apply for a stay of such provision pending a summary investigation by N. R. A., if he agrees in such application to abide by the decision of such investigation. This agreement is entered into pursuant to section 4(a) of the National Industrial Recovery Act and subject to all the terms and conditions required by sections 7(a) and 10(b) of that act.

There is no dispute but that the petitioner, in carrying out its contract for certain army construction at Fort Belvoir, Virginia, was

forced to expend the sum of $10,526.84 as an additional outlay for material and labor by reason of its signing and complying with the President's Reemployment Agreement. That fact has been stipulated. Inasmuch as petitioner had a loss in excess of $30,000 on its contract, it is clear that such loss was $10,526.84 greater than it otherwise would have been if petitioner had not signed such agreement. It is also clear that petitioner is entitled under the applicable statutes to take this loss as a deduction in some year. The question is in what year? The Commissioner takes the position that petitioner's entire loss on the contract should have been taken as a deduction in the year when the contract was completed, which, according to the stipulated facts, was either during the calendar year 1934 or the early part of 1935.

The petitioner claims that by reason of the President's Reemployment Agreement which it signed in 1933 and the claim which it filed with the Comptroller General under the Act of June 16, 1934, it had a debt against the United States for the amount of $10,526.84 which it was entitled to accrue and did accrue on its books as an asset and that when the Comptroller General denied petitioner's claim in July 1936 petitioner then and there ascertained such debt to be worthless and charged it off and is entitled to a deduction therefor in the year 1936 under section 23 (k) of the Revenue Act of 1936. We think it is true that if under the facts which are enumerated in the stipulation it can be said that the $10,526.84 extra expenditures which petitioner was compelled to make represented a debt of the United States, then petitioner's contention is well founded and it is entitled to the deduction which it claims. But was this $10,526.84 a debt of the United States? We think not.

In *Missouri Valley Bridge & Iron Co.*, 14 B. T. A. 1162, we said, among other things, as follows:

\* \* \* Before a deduction can be allowed on account of a worthless debt it is essential that the existence of a valid debt be established. *Luke & Fleming, Inc.*, 1 B. T. A. 12; *Louis Titus*, 2 B. T. A. 754; *Federal Fuel Co.*, 3 B. T. A. 814. In the last case cited this Board said:

> If the debtor was not legally liable to the taxpayer, then there was no debt to become worthless. It can not become worthless because of inability to establish legally the liability for the debt, for in such a case there is not an ascertainment of worthlessness of an existing debt, but an ascertainment of the nonexistence of such a debt.

After making the foregoing statement, the Board went on to say in the *Missouri Valley Bridge & Iron Co.* case: "In the instant case the petitioner has wholly failed to prove that there was ever a valid debt due it from the United States." To the same effect we think we must hold in the instant case.

The President's Reemployment Agreement which petitioner signed did not anywhere bind the United States Government to repay to peti-

tioner any excess expenditures for materials or labor which it might be required to make in the carrying out of such agreement. The Attorney General held, in an opinion in the year 1933, that heads of executive departments and independent establishments had the power and authority to enter into supplemental contracts, based upon good, and valuable consideration, with persons who made contracts with the Government prior to the date of the passage of the Industrial Recovery Act for the delivery of materials or the performance of labor subsequent to such date, agreeing to reimburse such persons for increased costs incurred by them as a result of the operation of the industrial codes or of the President's Reemployment Agreement. See 37 Op. Atty. Gen. 253.

While it is no doubt true, as the Attorney General held in the foregoing opinion, that proper representatives of the Government could have entered into a supplemental contract with petitioner increasing the cost figure of the contract which it held, in an amount sufficient to cover the increased costs occasioned by the signing of the President's Reemployment Agreement and the codes which were promulgated under the provisions of the Industrial Recovery Act, there is no evidence that any such supplemental contract was entered into. Petitioner's claim of $10,526.84, which is the subject of the claimed deduction in this proceeding, was not based upon any supplemental contract which it had with the United States Government but was based upon a law enacted by Congress June 16, 1934. That law is referred to in the stipulation of facts and is printed in the margin.[1] That law gives exclusive and final jurisdiction to the Comptroller General and claims rejected by the Comptroller General are not within the juris-

---

[1] § 28. [U. S. C. A., Title 41.] *Losses due to compliance with codes; claims for*

The Comptroller General of the United States is authorized and directed to adjust and settle on a fair and equitable basis claims of persons who entered into a contract or contracts with the United States prior to August 10, 1933, including subcontractors and materialmen performing work or furnishing material or necessary fuel direct to the contractor under such contracts, for additional costs incurred by reason of compliance on and after August 10, 1933, with a code or codes of fair competition approved by the President under section 703 of Title 15, or by reason of compliance with an agreement with the President executed under section 704 of Title 15 in the performance after August 10, 1933, of the contract or any part thereof. In the event that such contract was performed wholly or in part by a surety on the bond of the contractor, the claim may be presented by and settlement made with such surety, but such surety shall have no greater rights than would have accrued to the contractor had such contractor completed the contract. Any contractor, subcontractor, or completing surety desiring an adjustment and settlement with respect to any such contract under sections 28 to 33 of this title for increased costs incurred after August 10, 1933, by reason of compliance with the codes or reemployment agreements shall file with the department or administrative establishment concerned a verified claim itemizing such additional costs, and any subcontractor on any such contract may file his claim directly with the head of the department or independent establishment concerned or through the contractor. After the claim has been examined by the head of the department or independent establishment concerned, or such person or persons as he shall designate, the claim shall be transmitted to the Comptroller General of the United States, accompanied with an administrative finding of fact and recommendation with respect to the claim. (June 16, 1934, c. 553, § 1, 48 Stat. 974.)

diction of the United States District Courts. *Breen Stone & Marble Co.* v. *United States* (U. S. Dist. Ct. Minn., 1938), 21 Fed. Supp. 982.

While it is undoubtedly true that this Act of June 16, 1934, conferred upon petitioner the right to file the claim which it did file, there was no such certainty of the payment of the claim as would entitle petitioner to treat it on its books as an account receivable and carry it on its books in that manner until 1936 and then charge it off in that year as a bad debt when the Comptroller General denied its payment and take it as a deduction from income in 1936. We do not think the provisions of the law authorizing the deductions of bad debts ascertained to be worthless and charged off in the taxable year authorize such a deduction. The $10,526.84 involved in this proceeding was either deductible by petitioner in the year that it was expended as "Ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business" under section 23 (a) of the Revenue Act of 1934, or it was deductible as a loss, when the contract was completed, under section 23 (f) of the Revenue Act of 1934. *Commissioner* v. *Thatcher & Son*, 76 Fed. (2d) 900.

Let us assume that the tables were reversed in the instant case and we had before us the year when petitioner expended the extra amounts for material and labor which it did expend on account of signing the President's Reemployment Agreement, and petitioner was claiming as a deduction these expenditures and the Commissioner had denied the deduction because the petitioner had been given the right to file a claim under the Act of June 16, 1934, for reimbursement and had filed such a claim. Would we deny the deduction because such claim had been filed? We think not.

As said by the court in *Commissioner* v. *Thatcher & Son, supra:*

* * * The fact that the taxpayer expended some $63,000 in excess of what it received for completing the work of the defaulting subcontractors reduced its taxable income for the years when the expenditures were made. Had it succeeded in recovering damages from the subcontractors or their sureties, such recovery would have been income in the year when received. *Burnet* v. *Sanford & Brooks Co.*, 282 U. S. 359. * * *

The instant case is not like *Glendinning, McLeish & Co.*, 24 B. T. A. 518; affd., 61 Fed. (2d) 950. In that case the taxpayer had an unconditional contract that it would be reimbursed for the expenditures which it sought to deduct. Under such circumstances we held that the expenditures in question were not deductible in the year when made, and the Second Circuit affirmed. In the instant case, as we have already pointed out, the President's Reemployment Agreement which petitioner signed contained no provisions for reimbursement. The Act of June 16, 1934, made no guaranty to petitioner that it would be reimbursed for the extra expenditures which it had made. It merely gave petitioner the right to file a claim for reimbursement and conferred upon the Comptroller General the sole discretion to decide whether

such claim should be allowed. It turned out that in 1936 the Comptroller General rejected petitioner's claim, and, under an act which Congress passed in 1938 liberalizing the law with respect to reimbursements in such cases, petitioner has renewed its claim by bringing suit upon it in the Court of Claims, and that suit is still pending. We think the Act of 1938 and petitioner's suit brought in the Court of Claims thereunder does not affect, one way or the other, its right to the deduction which it claims in 1936.

The Commissioner argues in his brief that no deduction would be allowable to petitioner in any event until the termination of its suit in the Court of Claims under the Act of 1938. We do not agree with that contention. In our opinion petitioner's present suit in the Court of Claims has no effect whatever in the determination of what year it is entitled to take the deduction of $10,526.84. But, for reasons we have already stated, we think petitioner is not entitled to the deduction in 1936 and we sustain the Commissioner in his disallowance of it.

*Decision will be entered for respondent.*